Preston L. WATSON, As Administrator of The Goods and Chattels, Rights and Credits, which were of Robert A. Watson, Deceased,

v.

The UNITED STATES.

No. 50407.

United States Court of Claims.

May 1, 1956.

Writ of Certiorari Denied
Dec. 3, 1956.
See 77 S.Ct. 227.

John W. Burke, Jr., New York City, for plaintiff. Alfred C. B. McNevin and Burton H. Brody, New York City, were on the briefs.

William A. Stern II, with whom was Acting Asst. Atty. Gen. George S. Leonard, for defendant. Paris T. Houston was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

This is an action brought by plaintiff as administrator of the estate of Robert A. Watson, deceased, under a private act to recover alleged losses and damages suffered by plaintiff in the importation of sugar from the Argentine in 1920. The act, H.R. 990. 82d Congress, 1st Session, 65 Stat. A124, under which this suit is brought, provides as follows:

"* * * the Court of Claims * * * is, given jurisdiction to hear, determine on the merits, and to render in accordance therewith judgment upon the claim with such interest as the court may determine, of Preston L. Watson, as administrator * * * of Robert A. Watson, deceased, against the United States for alleged loss and damages suffered by Robert A. Watson arising out of certain transactions between said Robert A. Watson and the Department of Justice of the United States, involving the purchase and importation of sugar from the Republic of Argentina in June 1920, and the alleged neglect, refusal, and failure of the Department of Justice to provide for the distribution thereof in accordance with the terms of a written agreement between claimant's decedent

and said Department. Suit upon such claim may be instituted at any time within six months after the date of enactment of this Act, notwithstanding the lapse of time, laches, or any statute of limitations. Proceedings for the determination of such claim, and appeals from, and payment of, any judgment thereon shall be in the same manner as in the case of claims over which said court has jurisdiction under section 1491 of title 28 of the United States Code: *Provided,* That this Act shall be construed only to waive the defense of lack of authority of the Department of Justice or its officers in making said agreement and the immunity from suit of the Government of the United States with respect to the claim of Preston L. Watson, as administrator * * * of Robert A. Watson, deceased, and not otherwise to effect any substantive rights of the parties. Enactment of this Act shall not be construed to raise any implication of liability by the United States."

The questions presented are: (1) Whether or not the United States entered into a written agreement with Watson providing for the distribution of Watson's sugar; (2) if such an agreement was entered into, did defendant undertake to furnish purchasers at any particular price; (3) if there was such a contract, did plaintiff establish a breach thereof by defendant; and (4) if there was a breach, did plaintiff prove any losses or damages.

As an aftermath of World War I, certain economic dislocations occurred which contributed to a great shortage of sugar in the United States in 1920. To prevent profiteering, Congress, in 1919, had passed a food control act popularly known as the Lever Act, 41 Stat. 297, which imposed criminal penalties upon persons guilty of making unreasonable charges for necessaries. Enforcement of the Lever Act was in charge of the Department of Justice.

In May 1920, Watson, through his broker, arranged to purchase 9,850 tons of Argentine sugar. He was obligated to furnish the Argentine seller with letters of credit for the sugar, of which only 70 percent could be exported to the United States. On June 10, 1920, Watson arranged with J. P. Morgan & Company to issue a letter of credit for 1,000 tons. Watson set about reselling the sugar he had purchased, and, on June 12, 1920, sold 2,000 long tons at 19 cents per pound to Lowney & Company of Boston, Massachusetts. On June 16, 1920, he agreed to sell to E. Atkins & Company 2,000 tons at 19¼ cents per pound. The Lowney and Atkins sales were evidently financed by letters of credit issued by those purchasers to Watson, or the Argentine seller. Thus, by June 16, 1920, Watson had sold 4,000 tons and had arranged for financing the importation of 4,000 tons.

During the early part of June 1920, and before June 10, 1920, J. P. Morgan & Company and other banks considering the financing of the importation of Watson's sugar, were concerned about becoming involved in Lever Act prosecutions. One of Morgan's attorneys, Mr. Walter S. Orr, was assigned to determine what arrangements might be concluded to assure Watson's freedom from Lever Act prosecution if he imported sugar into the United States and sold it.

Beginning June 11, 1920, Orr and Watson conferred with a special assistant to the Attorney General, who suggested they confer with Armin W. Riley, a special assistant to the Attorney General, whose office was in New York.

On June 18, 1920, Riley, Watson, and Orr held a conference which ended with an arrangement that Watson and Orr draft a letter setting forth their understanding of the conference with Mr. Riley.

Immediately following the conference on June 18, 1920, Watson drafted a letter to Riley summarizing the situation and their discussion. This draft reads as follows:

"I take this opportunity of confirming to you my understanding of ~~our~~ the attitude of the Govt as it relates to importations of Argentine Sugar by me.

"I propose & have arranged financing for the purpose ~~of~~ to import during the next three months a large quantity of refined Argentine sugar.

"I propose to sell this sugar ~~to~~ where it will reach such channels as ~~you~~ the Dept of Justice through your instrumentality may indicate and which I understand will be in the direction which will be for the public good.

"In consideration of my accepting the control of the Dept. for the distribution of my importations of Argentine sugar in the ~~channels~~ manner above described and which I accept I understand & desire you to so confirm that I will be permitted to sell said importations at a profit not exceeding?"

Watson submitted the draft to Orr, who prepared another draft which was given to Watson, who set it up on his own stationery and sent it to Riley. The letter was sent by Watson June 19, 1920, and comprises the first item in an exchange of correspondence upon which plaintiff relies as a contract in writing. Plaintiff's claim in this suit is based upon an alleged breach of that contract by defendant. The letter of June 19, 1920, from Watson to Riley, reads as follows:

"In connection with the proposed purchase of a large quantity of refined Argentine sugar, I have been in communication with your office, both in Washington and in New York, in order to clarify the situation, particularly as regards the operation of the Lever Act applied to the sale of this sugar in the United States.

"The facts are substantially these.

"I am in a position to accept offers for refined Argentine sugar, which it was proposed to market in this country. In order to obtain the sugar, it was necessary to present the proposition to financial institutions so that proper arrangements could be made to establish credits necessary to finance the purchase.

"You will appreciate that the regulations concerning the export of sugar, issued by the Government of the Argentine Republic, and the attendant hazards in connection with the purchase and sale of this sugar make this transaction entirely different from the ordinary transactions carried on by the ordinary wholesaler of sugar in this country.

"In view of the great shortage of sugar in this country, it was deemed advisable to discuss with your department the advisability of bringing this sugar to America, and the possible effect of the Lever Act upon the profit believed to be necessary in order to meet the risks involved and the necessary financing.

"Some days ago this situation was fully discussed with your department in Washington and the difficulties arising under the Lever Act seemed to be such as to make it inadvisable for me to pursue the matter further, but the great shortage of sugar in this country and the need to take measures to relieve the same has caused me to take up the matter anew with you in order to see if the transaction can be consummated. I am therefore laying the matter before you again for consideration, after an informal discussion with you today. I am prepared to do my best to carry the transaction through, provided your department will write me a letter giving its sanction to the importation of sugar from Argentina upon the following conditions:

"1. Upon the basis of the present cost price to me of refined Argentine sugar, approximately 17¼ cents per pound c. i. f. American

ports, I propose to market the sugar at not exceeding 20 cents per pound.

"2. Should the cost price to me of refined Argentine sugar change, the sale price by me would increase or decrease proportionately, as the case may be, so that the sale price might be either greater or less than 20 cents per pound, dependent upon the cost price to me.

"3. I agree to permit your office to designate the channels through which this sugar shall be distributed, provided that the ultimate purchasers satisfy me as to their financial standing, and as to the terms of settlement.

"Inasmuch as I expect to begin the importation of this sugar at once, it is highly important that your decision be rendered immediately, so that negotiations can be completed and credits cabled."

On June 23, 1920, Watson wrote to Riley as follows:

"I take this opportunity of confirming to you my agreement to distribute all sales made after this date of Argentine sugar which I may import in such direction as you may from time to time indicate, and I am very pleased indeed to think that with your cooperation I can supply those industries which are badly in need of this commodity at a lower net price than they can obtain in any other direction. * * *"

In reply to these two letters, Riley wrote a letter to Watson on June 23, 1920, reading as follows:

"This is to confirm our various conversations and in reply to your letters of June 19 and 23, 1920.

"In view of the fact that the sugar requirements of the people of this country are in excess of the supply now available and in order to encourage the importation into this country of foreign sugars, you will be permitted to import the sugars

mentioned upon the terms set forth in your said letters.

"You are further informed that if you carry out the Department's requirements as to price and distribution as so set forth, no prosecutions under the Lever Act, as amended, will arise therefrom."

Plaintiff also claims that Watson wrote another letter to Riley on June 23, 1920, in which he advised Riley that he had 1,000 tons of sugar for July shipment "and understand you are referring interested parties to me today or tomorrow. I will be pleased to see them at any time." Riley, in his testimony denied having received the letter, and there is no competent proof that said letter was actually sent by Watson.

After the exchange of the foregoing correspondence, Watson arranged with the Bank of British West Africa for a letter of credit in the sum of $120,000, the commitment for which remained unused until December 2, 1920. The only other credit obtained by Watson after that date was an additional letter of credit from J. P. Morgan & Company, known as Credit No. 41, covering 1,000 tons of sugar in an aggregate amount of $348,500.

The American market for imported white sugars began to decline during the week ending June 3, 1920, and, during the remainder of the month the market slackened considerably. On June 24, 1920, the Department of Justice announced that a purchase of 14,000 tons of Argentine sugar by American Trading Company had been purchased under the direction of the Department of Justice and would be distributed under the direction of the Government agencies to essential industries and household consumers. The market for imported sugar continued its decline, and, by July 15, 1920, the demand therefor was very quiet and it was quite difficult to dispose of such sugars except in scattered localities where supplies were still limited.

On July 19, 1920, Morgan opened its Letter of Credit No. 41. Between June

23, 1920, the date of Riley's letter, and July 19, 1920, it is not established that Watson had the financing with which to offer Argentine sugar for sale except the commitment of $120,000 made by the Bank of British West Africa which was unused until December 1920. After June 23, 1920, there is no evidence that Watson made any commitments for the purchase of Argentine sugar in addition to those made by him in late May or early June, except insofar as Morgan Credit No. 41, and the credit arranged with the Bank of British West Africa may have been used to make the earlier commitments of Watson available for offer by Watson on the American market. It was not established that in obtaining the credits with the Bank of British West Africa or Morgan Credit No. 41, Watson did so in any reliance on any commitment or undertaking by Riley to supply the names of potential purchasers of Watson's sugar.

The market, during July and August 1920, continued to decline. Some time during July, and the early part of August 1920, part of the sugar purchased by Watson was shipped from Argentina on account of the sales to Lowney and Atkins and on account of the Morgan credit of June 10, 1920. Shortly after August 19, 1920, the *S.S. Winona* left Buenos Aires for New York with 973 long tons of Argentine sugar consigned by Watson's seller to J. P. Morgan & Company, and 808 tons consigned to Watson.

It is not established by the evidence that after the date of the Riley letter Watson was in a position to offer Argentine sugar for sale in the United States prior to the departure of the *S.S. Winona* from Buenos Aires.

When the *S.S. Winona* arrived in New York on September 22, 1920, American refined sugar was being quoted at 14½ cents per pound, and thereafter sugar quotations continued a steady decline.

The 1,781 long tons of sugar aboard the *S.S. Winona* were sold at prices of approximately 5.6 cents per pound, leaving Watson indebted to Morgan for more than $200,000 and to the Bank of British West Africa for more than $31,000. Watson's sugar purchases which had not been imported from Argentina consisted of 1,429 long tons, and were sold there at a price of approximately 7.8 cents per pound. Plaintiff is seeking damages for losses sustained by Watson both on the sugar which was imported and the sugar which remained in Argentina.

It was not established by the evidence that a loss was sustained on account of the sugar sold in Argentina, or that if any such loss was sustained it fell on Watson, or that if Watson sustained such a loss it had no relation to the Watson-Riley agreement of June 1920.

The evidence as a whole warrants the inference that Watson's venture in Argentine sugar was ruinous to him, that his indebtedness to the banks was a substantial factor in contributing to his ultimate ruin, and that he did suffer severe losses in the liquidation of the 1,781 tons of sugar shipped on the *S.S. Winona,* but that the amount of his losses in the liquidation of the 1,781 tons cannot be determined from the evidence with exactness.

It is not established by the evidence that Riley intended to undertake, or implied that he would undertake to supply to Watson the names of purchasers who would buy the sugar Watson expected to import, or that Watson understood Riley at the time to intend or imply such an undertaking.

It was not established by the evidence "that Riley did not 'designate the channels through which sugar shall be distributed' at the conference with Watson on June 18, 1920."

It was not established by the evidence that after the Watson-Riley correspondence of June 1920, Watson sought, or refrained from seeking, purchasers of sugar because of anything contained in the agreement, or that after the Watson-Riley agreement the market in the United States for granulated sugar brought, or to be brought, from the Argentine, was ever such that Watson

could have disposed of his commitments, or any part thereof, at a profit to him.

At the conclusion of the presentation of plaintiff's evidence, defendant moved the court to dismiss the petition, and, on the basis of the findings of fact, with particular reference to the failure of proof recited in findings 21, 23(c), 27, and 29, the commissioner recommended that defendant's motion be granted and the petition dismissed.

It is incumbent upon the plaintiff in order to recover, under the terms of the reference act, to show (1) that a contract was entered into between Watson and the United States to furnish purchasers of sugar at a particular price; (2) to show a breach of the contract; and (3) to prove damages.

A review of the record reveals it is not established by the evidence that between June 23, 1920 (the date of Riley's letter) and July 19, 1920 (the date of Morgan Credit No. 41), Watson had the financing with which to offer Argentine sugar for sale, excepting the commitment of $120,000 of the Bank of British West Africa, which was unused until December; or that after June 23, 1920 (the date of the Riley letter), Watson made commitments for the purchase of Argentine sugar in addition to those made by him in late May or early June through Bolle and Compania, except insofar as Morgan Credit No. 41, and the credit arranged with the Bank of British West Africa may have been used to make the earlier commitments of Watson, Bolle, and Compania available for offer by Watson on the American market; or that Watson, in arranging either the $120,000 credit with the Bank of British West Africa or Morgan Credit No. 41, did so in reliance on any commitment or undertaking by Riley to supply the names of potential purchasers of Watson's sugar; or that after June 23, 1920 (the date of the Riley letter), Watson was in position to offer Argentine sugar for sale in the United States prior to the departure of the S.S. Winona from Buenos Aires; that a loss was sustained on account of the sugar sold in Argentina; or that any of such loss, if one was so sustained, fell on Watson; or that if Watson had sustained such a loss, it would have any relation to the Watson-Riley agreement of June 1920; or that Riley intended to undertake or implied that he would undertake to supply to Watson the names of purchasers who would buy the sugar Watson expected to import, or that Watson understood Riley at the time to intend or imply such an undertaking; or that Riley did not "designate the channels through which the sugar shall be distributed" at the conference with Watson on June 18, 1920; or that, after the Watson-Riley agreement of June 1920, Watson sought or refrained from seeking purchasers of the sugar because of anything contained in the agreement; or that, after the Watson-Riley agreement of June 1920, the market in the United States for granulated sugar brought or to be brought from the Argentine was ever such that Watson could have disposed of his commitments or any part thereof at a profit to him.

Therefore, we conclude that there was an agreement between Watson and Riley but that the only purpose of the agreement was that Watson be granted freedom from Lever Act prosecution and there was no attempt to obtain any promise from the Government to furnish purchasers of sugar. Under the agreement Watson was not free of all restrictions upon distribution. He could not sell to a speculator nor to any one not in a normal channel of distribution. However, he could distribute in normal channels except where the Department of Justice might direct otherwise, such as hospitals. Even then he was not forced to sell unless he was satisfied as to the financial status of the purchasers.

The only reasonable inference is that Watson gambled and lost due to a declining market.

For failure of proof we adopt the recommendation of the commissioner and dismiss the petition.

MADDEN, WHITAKER and LITTLETON, Judges, concur.

JONES, Chief Judge, took no part in the consideration or decision of this case.

## Findings of Fact

The court, having considered the evidence, the report of Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:

1. (a) Plaintiff is the duly qualified administrator of the estate of his father, Robert A. Watson, who died intestate on December 30, 1943.[1]

(b) This suit was filed on November 15, 1951, under authority contained in an Act of Congress approved October 18, 1951, and the suit is prosecuted pursuant to the terms of that statute.[2]

2. (a) All remaining facts material to the action relate to the activities of plaintiff's father (hereinafter referred to as Watson) who was engaged in the business of importing cocoa, sugar, and other commodities.

(b) The transactions material to the action took place in 1920, and relate to the importation of granulated sugar from the Argentine Republic for sale in the United States.

3. (a) One of many evidences of economic dislocations in the United States in 1920, reflecting the aftermath of World War I, was a shortage of sugar.

(b) At the time of the transactions material to this suit, the Food Control Act (popularly known as and hereinafter called the Lever Act)[3] imposed criminal penalties upon any person guilty of willfully making "any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries" and for exacting "excessive prices" therefor. "Necessaries," as used in the act, included sugar.

(c) Some time after the amendment of the Lever Act in October 1919, the enforcement of the act was placed under the supervision and direction of the Attorney General of the United States. During the weeks or months immediately prior to the Watson transactions, a Special Assistant to the Attorney General (Howard E. Figg) had formed committees of industry representatives to determine and declare fair prices for some of the commodities affected by the Lever Act, including sugar. During the days or weeks immediately prior to the Watson transactions, a change of policy was adopted by the Attorney General, in relation at least to sugar, and another Special Assistant (Armin W. Riley) was placed in charge with instructions to abandon the so-called "fair price commissions" and to enforce the Lever Act according to its terms.

4. During the year 1920 there was published weekly in New York a statistical trade journal (established several years earlier) known as the Weekly Statistical Sugar Trade Journal.[4] On the second page of each issue there was a brief summary of the week's developments in the market for refined sugar.[5] Following are excerpts from the summaries contained in five succeeding issues of the Journal extending from April 29 to May 27, 1920.

(1) April 29, 1920. "* * * During the week there was quite an active demand for high grade white sugars, and

1. Letters of administration upon the goods and chattels, rights and credits, which were of Robert A. Watson, were granted to plaintiff on February 28, 1948, by the Surrogate of Essex County, New Jersey.

2. The text of the act is set forth in finding 30, from 65 Stat. A124.

3. The Act of August 10, 1917, 40 Stat. 276, as amended by the Act of October 22, 1919, 41 Stat. 297.

4. Volume 44 of the Journal, containing all of the 1920 issues, is in evidence as plaintiff's exhibit No. 5.

5. There is no evidence that Watson, his broker or his bankers, or the representatives of defendant with whom Watson dealt, read the Journal or were influenced by its reports.

sales are reported of Javas and other whites at full up prices, which figure from 20¢ to 21¢ a pound, duty paid."

(2) May 6, 1920. "The new announcements of allotment prices have been the 23¢ basis named by Warner and * * * 23¢ by Arbuckle * * *. Arbuckle * * * also issued instructions that all withdrawals and contracts must bear Food Administration license number of buyer * * *. Brokers license number must also be stated. This policy will undoubtedly be adopted by all refiners. * * * All refiners have apparently agreed to discontinue selling sugar to any buyer who intends purchasing only for speculative reasons * * *. The Department of Justice, which has been making an extensive investigation * * * has presented or expects to bring charges against some prominent sugar concerns in New York City for alleged profiteering." [6]

(3) May 13, 1920. "Several changes were made in allotment basis by refiners during the week. * * * the Savannah * * * allocation price was 18.-50¢ and * * * Henderson * * * quoted 23¢. * * * American announced an advance from 18.50¢ to 19.50¢ and * * * Howell made announcement to the same effect. Revere * * * quotes 21.50¢. Business in high grade raw sugars has been quite active during this week, the latest quotations being about 22¢ duty paid for this class of sugar."

(4) May 20, 1920. "The changes in allotment basis * * * during the week were advances by American and Howell * * * to 20.50¢ and * * * by * * * California * * * to 23.-25¢ * * *. This morning American

advanced to 21.50¢ * * *. * * * Federal were considering offerings for July/August shipment at 26¢ * * * and the sugars were rapidly absorbed."

(5) May 27, 1920. "The only changes reported are that Howell and American advanced their allotment prices to * * * 21.50¢ and 22.50¢, respectively, and Arbuckle to 26.50¢. White raws are on offer at somewhat lower prices, say 22¢ to 23¢ duty paid."

5. (a) On May 28, 1920, Watson requested his broker, Bolle, Watson and Company (hereinafter referred to as Bolle) to purchase for his account 10,000 tons of Argentine granulated sugar.

(b) Bolle transmitted the request to Compania De Commercia "Transoceana" of Buenos Aires (an Argentine corporation hereinafter referred to as Compania), and Compania certified to Bolle that it had purchased for Watson's account 9,850 tons of Argentine sugar.[7]

(c) Of the purchases so certified, Compania reported that 2,000 tons were purchased on May 29, 1920, the day after Watson's order;[8] 4,350 tons were purchased the next week (2,350 tons on June 2 [9] and 2,000 tons on June 3); and 3,500 tons were purchased on June 12, two weeks after the initial purchase.

6. (a) Under the terms of the purchase agreement, 70 per cent of the quantities of sugar listed in the preceding finding was for export, and 30 per cent, including the 2,000 tons of pile sugar, was held for deposit by the Argentine Government for home consumption until August 22, 1920, at which time the Argentine Government was either to take over the deposit on the basis of a stated price or to permit the sale of the

6. References in this and subsequent quotations from the Journal to "allotments" and "licenses" presumably pertain to the mechanics of the administration of the Food Control Act other than prosecutions for profiteering. The evidence in this case does not refer to these mechanics except by the merest indirection, and there is no evidence from which to piece together the full story of sugar during and immediately after World War I.

7. Bolle and Compania had had previous dealings in grain. This appears to have been their first transaction in sugar.

8. Bolle confirmed this purchase by letter to Watson dated June 1, 1920, as being for "June/July arrival at Buenos Aires."

9. The June 2 purchases consisted of 350 tons of granulated sugar and 2,000 tons of pile sugar.

sugar for home consumption at market value.

(b) The terms of the sale further required Watson to open immediately, at Buenos Aires, an irrevocable letter of credit in favor of Compania. Payments against the letter of credit were to be made upon presentation of and in exchange for shipping documents (bills of lading) or storage receipts (deposit certificates or warehouse receipts) or any combination thereof. Delivery was to be made in July and August 1920.

7. On June 5, 1920, Watson advised the Walter M. Lowney Company, of Boston, that he was "authorized to close 2,-000 tons of Argentine * * * sugar * * * June/July shipment from Buenos Aires." In a subsequent telephone conversation, which Lowney confirmed by a letter dated June 8, Lowney advised it could take this quantity of sugar and asked "to have contracts presented for execution." A contract for the purchase by Lowney of 2,000 long tons at 19 cents per pound was made and dated June 12, 1920.[10]

8. (a) Some time during the weeks or months immediately prior to the Watson transactions, J. P. Morgan and Company (hereinafter referred to as Morgan) and other bankers organized the Foreign Finance Corporation, with a Morgan partner as its head, to finance importations of sugar (and possibly other commodities).

(b) On June 10, 1920, Morgan cabled its correspondent in Buenos Aires instructions to advise Compania of the opening of a letter of credit in favor of Compania in the amount of $348,500 for

the account of Watson against shipments aggregating 1,000 long tons of sugar,[11] drafts to be drawn at 90-day sight, accompanied by shipping documents made out to the order of Morgan, shipments to be completed and bills drawn before July 31, 1920. This letter of credit was designated by Morgan as Credit No. 40.[12]

9. (a) Some time during the early part of June 1920 (before June 10), one of Morgan's attorneys (Walter S. Orr, hereinafter referred to as Orr) advised the head of Foreign Finance Corporation that in financing importations of sugar care should be exercised to avoid involvement in complications under the Lever Act. Orr was thereupon given the assignment of seeing what arrangements, if any, could be made to assure Watson's freedom from Lever Act prosecution if he imported sugar into the United States and sold it.[13]

(b) On June 11, 1920, Orr and Watson conferred in Washington with Special Assistant to the Attorney General Howard E. Figg in relation to possible means of importing sugar without incurring Lever Act sanctions. Figg, who was not a lawyer, was unable to advise them how the importation might be so made, and suggested that they confer with Special Assistant Armin W. Riley (who was a lawyer, and whose office was then in New York).

10. On June 16, 1920, Watson entered into an agreement with E. Atkins and Company for sale by him to Atkins of 2,000 long tons of Argentine sugar at 19¼ cents per pound, for shipment from

---

10. Lowney arranged credit to cover the purchase through the International Trust Company of Boston. According to an affidavit made by Watson on December 10, 1920, the shipment against this letter of credit was 800 tons short.

11. This credit amounted to approximately 16 cents per pound, and the Morgan letter specified "not exceeding 16 cents per pound."

12. Another Morgan credit, designated as

Credit No. 41, appeared later in the Watson transactions.

13. The evidence does not show specifically any approach by Watson to Foreign Finance Corporation as distinguished from Morgan in Watson's search for credits. Inasmuch, however, as Watson had undertaken a transaction involving $3,000,000 or more, it is a fair inference that Foreign Finance was interested in Watson and vice versa.

the Argentine during "June/July 1920." [14]

11. Some time after Watson's sales to Lowney (finding 7) and to Atkins (finding 10), Watson and Bolle entered into a contract embodying the terms of the agreement between Bolle and Compania (described in finding 6) and fixing the commission to be received by Bolle, with specific references to the sales to Lowney and Atkins, and generally as to additional quantities.

12. Following are excerpts from the summary reports on refined sugar as contained in the Weekly Statistical Sugar Trade Journal in three succeeding issues extending from June 3 to June 17, 1920.

(1) June 3, 1920. "No changes were made during the week in local allotment prices, except that American has extended their * * * price of 22.50¢ to cover July and August shipments, but we have advices from San Francisco * * * [which] * * * indicates an increasing supply of sugars on the West Coast, and as the California beet crop will soon be going to harvest, the West Coast refiners should then be enabled to forward their sugars as far east as * * * Chicago * * *. This condition of affairs, together with the increasing imports of foreign raws, suitable for grocery and manufacturing trade, and the increased meltings at the Atlantic ports and Gulf refineries, should soon be able to relieve the general demand for refined sugar. As it is, while the demand is still large, there does not appear to be the active inquiry that was previously noted for refined sugars, and for this reason *it is somewhat difficult to dispose of imported white sugars*.[15] The sale of this latter group of sugars has also been affected by the sharp decline in raws recently as well as the difficulty of obtaining credits that are necessary to finance such purchases. Java, Argentine, and other sugars have been offered in round quantities at various prices, from 22½¢ down to 20¢ c. i. f."

(2) June 10, 1920. "During the week American * * * announced that they were alloting granulated sugar at 22.50¢ less 2% for September, October and November/December shipments, and * * * Howell announced change in their allotment basis to 22¢. Warner allotted sugars for July/August shipment, their option, at 24¢. * * * Western * * * advanced their allotment price to 26.30¢ * * *. The first check in the advancing prices for refined is wired from San Francisco, where * * * Californian * * * reduced their allotment basis from 26.30¢ to 25¢. There is a decided slackening off in the demand from manufacturers and jobbers for white raws and it is much more difficult to dispose of these sugars, although they are freely offered at lower prices than have been recently paid. Several markets have reported that conditions are much improved and that the trade is now getting an increased quantity of sugar. The arrivals of foreign granulated and white raws are large this week * * *. Advices from Michigan report that the acreage planted in beets for this fall's crop has increased 30% from last year."

(3) June 17, 1920. "Some changes have been made in allotment prices, Savannah adjusting their price from 18.-50¢ to 20.50¢, and the McCahan from 20.50¢ to 19.50¢. San Francisco's two refineries * * * have reduced their allotment basis from 25¢ to 23.50¢. * * * American at New York continues to name 22.50¢ and the National 22¢, while Arbuckle, Federal, and Warner are temporarily out of the market. It is much more difficult to dispose of high grade raws * * *. * * * all Canadian refiners now quote basis 19.95¢ * * *."

13. On June 18, 1920, Watson and Orr conferred with Special Assistant to

14. The purchaser agreed to open bank credits immediately in New York for the full invoice value.. It is to be inferred that some such credit was arranged, since Atkins ultimately paid Watson an amount sufficient to cover 1,948 long tons at 19¼ cents per pound.

15. Emphasis supplied.

the Attorney General Armin W. Riley, (hereinafter referred to as Riley) concerning possible arrangements for Lever Act clearances in Watson's importations and sale of sugar.

14. (a) Thirty-four years after the event (in August 1954) Mr. Orr testified that Mr. Riley had said to him and Watson that the country was very much in need of sugar, particularly the canneries, because it was June and the fruit was coming in, but that if the sugar was to be imported it would have to be distributed by or through the Department of Justice; that the Department had no physical equipment for the distribution of it, but that something would be arranged. He further testified that Mr. Riley suggested that they (Watson and Mr. Orr) "get up a letter setting forth our understanding of the arrangements made with the Department of Justice through Mr. Riley."

Mr. Orr further testified that Mr. Riley exhibited a number of lists showing the quantity of sugar wanted by various people; that there was discussion of a profit to be made on the imported sugar of a cent and a fraction per pound; that the word "channels" may have been used in the conversation, although he could not be sure; that Mr. Riley may have said that he wanted the sugar distributed either to ultimate retailers or hospitals or organizations who had uses for the sugar that was necessary for the public good; that Mr. Riley may have agreed to designate channels before the sugar arrived; and that, in fact, Mr. Riley showed them " * * * some channels * * * or some orders, or some places where he wanted it to go."

(b) Thirty-three years after the event (in February 1953) Mr. Riley testified

that he told Watson that he (Watson) could bring in the sugar and distribute it according to the normal channels of distribution, and that he should not figure on more than one cent a pound profit, "which, of course, was a bit fluid, that one cent * * *." Mr. Riley further testified that the normal course of distribution meant sales by the importer to the wholesaler to the retailer to the ultimate consumer; that he was referring to normal channels of trade " * * * who had uses of sugar that was necessary for the public good;" that he was primarily interested in getting rid of the speculators; [16] and that the only way he could have enforced his stipulation with Watson was by presenting the case to the grand jury, since he had never urged Watson to import sugar,[17] and that he never told Watson that he (Watson) would have to have his (Riley's) permission or consent for any transaction.

Mr. Riley further testified that in his conversation with Watson and Mr. Orr he never had reference to individual buyers; that the lists he showed to them were lists of purchases that had been reported to him by a committee of importers for assurance to him that the imported sugars were going into proper channels of trade; and that when he got the lists the transactions shown thereon had been consummated.

15. (a) Immediately after the Riley-Watson-Orr conference on June 18, 1920, Watson drafted a letter to Riley, summarizing the situation and their discussion. Following is the text of the Watson draft:

"I take this opportunity of confirming to you my understanding of our the attitude of the Govt as it relates to importations of Argentine Sugar by me.

16. "As, for instance, they had a group meeting in the Yale Club once of six brokers who each sold to the other large shipments of sugar. When they came in the sugar was a certain price and when they went out it was six cents higher, and nobody was benefited by it except the brokers and it hadn't proceed-ed one step toward the ultimate consumer." From the deposition of Armin W. Riley, page 12.

17. Mr. Riley testified (p. 39) that he did ask a committee of sugar importers to try to bring sugar into the United States from Argentina, but that Watson was not a member of the committee.

"I propose & have arranged financing for the purpose of to import during the next three months a large quantity of refined Argentine sugar.

"I propose to sell this sugar to where it will reach such channels as you the Dept of Justice through your instrumentality may indicate and which I understand will be in the direction which will be for the public good.

"In consideration of my accepting the control of the Dept. for the distribution of my importations of Argentine sugar in the channels manner above described and which I accept I understand & desire you to so confirm that I will be permitted to sell said importations at a profit not exceeding?"

(b) Watson gave his draft to Orr, who prepared another letter, which he submitted to the senior member of his law firm, by whom some changes were made in Orr's draft. Orr gave the amended copy to Watson, who set it up on his own stationery, and sent it to Riley.

The letter was dispatched by Watson to Riley on June 19, 1920, and comprises the first item in an exchange of correspondence upon which plaintiff relies as a contract in writing. Plaintiff's claim in this suit is based upon an alleged breach of the contract by defendant.

16. The exchange of correspondence described in the preceding finding follows:

(a) June 19, 1920, from Watson to Riley:

"In connection with the proposed purchase of a large quantity of refined Argentine sugar, I have been in communication with your office, both in Washington and in New York, in order to clarify the situation, particularly as regards the operation of the Lever Act applied to the sale of this sugar in the United States.

"The facts are substantially these.

"I am in a position to accept offers for refined Argentine sugar, which it was proposed to market in this country. In order to obtain the sugar, it was necessary to present the proposition to financial institutions so that proper arrangemens could be made to establish credits necessary to finance the purchase.

"You will appreciate that the regulations concerning the export of sugar, issued by the Government of the Argentine Republic, and the attendant hazards in connection with the purchase and sale of this sugar make this transaction entirely different from the ordinary transactions carried on by the ordinary wholesaler of sugar in this country.

"In view of the great shortage of sugar in this country, it was deemed advisable to discuss with your department the advisability of bringing this sugar to America, and the possible effect of the Lever Act upon the profit believed to be necessary in order to meet the risks involved and the necessary financing.

"Some days ago this situation was fully discussed with your department in Washington and the difficulties arising under the Lever Act seemed to be such as to make it inadvisable for me to pursue the matter further, but the great shortage of sugar in this country and the need to take measures to relieve the same has caused me to take up the matter anew with you in order to see if the transaction can be consummated. I am therefore laying the matter before you again for consideration, after an informal discussion with you today. I am prepared to do my best to carry the transaction through, provided your department will write me a letter giving its sanction to the importation of sugar from Argentina upon the following conditions:

"1. Upon the basis of the present cost price to me of refined Ar-

gentine sugar, approximately 17¼ cents per pound c. i. f. American ports, I propose to market the sugar at not exceeding 20 cents per pound.

"2. Should the cost price to me of refined Argentine sugar change, the sale price by me would increase or decrease proportionately, as the case may be, so that the sale price might be either greater or less than 20 cents per pound, dependent upon the cost price to me.

"3. I agree to permit your office to designate the channels through which this sugar shall be distributed, provided that the ultimate purchasers satisfy me as to their financial standing, and as to the terms of settlement.

"Inasmuch as I expect to begin the importation of this sugar at once, it is highly important that your decision be rendered immediately, so that negotiations can be completed and credits cabled."

(b) June 23, 1920, from Watson to Riley: [18]

"I take this opportunity of confirming to you my agreement to distribute all sales made after this date of Argentine sugar which I may import in such direction as you may from time to time indicate, and I am very pleased indeed to think that with your cooperation I can supply those industries which are badly in need of this commodity at a lower net price than they can obtain in any other direction. * * *"

(c) June 23, 1920, from Riley to Watson:

"This is to confirm our various conversations and in reply to your letters of June 19 and 23, 1920.

"In view of the fact that the sugar requirements of the people of this country are in excess of the supply now available and in order to encourage the importation into this country of foreign sugars, you will be permitted to import the sugars mentioned upon the terms set forth in your said letters.

"You are further informed that if you carry out the Department's requirements as to price and distribution as so set forth, no prosecutions under the Lever Act, as amended, will arise therefrom."

17. (a) Within that portion of June 1920 preceding the foregoing exchange of correspondence Watson had arranged for credits covering 5,000 long tons of sugar: 2,000 tons sold to Lowney; 2,000 tons sold to Atkins; and 1,000 tons covered by Morgan's Credit No. 40.

(b) Within that portion of June 1920 following the exchange of correspondence set forth in the preceding finding, Watson arranged with the Bank of British West Africa for a letter of credit in the amount of $120,000. This commitment remained unused until December 2, 1920.

18. (a) On June 24, 1920, Special Assistant to the Attorney General Howard E. Figg issued to the press the following statement:

"The sugar purchased in Argentine by the American Trading Company, was purchased under the direction of the Department of Justice and representations made by the State Department to President Iro-

18. Plaintiff attached to his petition as Appendix B, a purported letter from Watson to Riley, which was also dated June 23, 1920. Although Riley testified (more than 30 years after the event) that he never received the letter, it is possible that it was delivered to Riley, and that it is the letter of June 23 to which Riley referred in his reply. In that event, the instant letter of June 23 from Watson to Riley may have been Watson's response to Riley's reply. The text of the purported letter from Watson to Riley follows: "I enclose your letter, which I think will cover the matter which we discussed this morning and if you can kindly hand bearer the response, I will proceed in this matter immediately. I have 1,000 tons for July shipment and understand you are referring interested parties to me today or tomorrow. I will be pleased to see them at any time."

goyen that the same was purchased and would be distributed under the direction of Government Agencies, is entirely correct. The American Trading Company, with the assurance of the Department of Justice that a permit would be issued for the exportation of certain sugars, entered the Argentine market and purchased these sugars at the prevailing market prices. When 14,000 tons had been secured a formal request was made for permits to export. In the meantime, a decree providing certain restrictions had been issued by the Argentine Government. When proper representation was made to President Irogoyen, for the issuance of the permit he consented to do so on the assurance that these sugars were for distribution by the Department of Justice, and not purchased by private American interests. On arrival in New York, this sugar will be distributed by the United States Government to the essential industry and household consumer."

(b) Neither the American Trading Company nor the transaction to which the foregoing statement relates is otherwise identified or explained by the evidence.

19. Following are excerpts from the reports on refined sugar as contained in the Weekly Statistical Sugar Trade Journal in four succeeding issues extending from June 24 to July 15, 1920.

(1) June 24, 1920. "* * * California & Hawaiian * * * refined sugars * * * are being offered at 23¢ less 2% at San Francisco on an open basis, that is to say that allotments are now done away with on the coast. * * * Western * * * also reduced their quotation to 23¢ * * *. This apparently is an indication that before long these sugars will be offered openly in all markets. There have been no changes in the local refiners quotation, but the demand generally has slackened, and there is an increased number of refiners allotments declined by buyers. Regarding the high grade raws and foreign refined, the arrivals of these sugars continue to come along steadily * * *. Buyers in some instances appear to have overbought on these raw sugars and the offering to re-sell some of them has been one of the causes of the weakness in the raw market. * * * Howell * * * have a line of Argentine white sugars which *they are disposed to offer* to the canning and packing trade only on the basis of 21.30¢ less 2% f. o. b. New York.[19] These sugars are destined to arrive at New York August/September and early October. * * *"

(2) July 1, 1920. "The demand generally for refined sugar has fallen off and there is more disposition on the part of holders of high class raws to dispose of same. * * * Arbuckle * * * have sold all the sugar available at their last allotment price of 24¢ and * * * they are now temporarily withdrawn. * * * The demand on the West Coast * * * has been very light and it has necessitated a further decline in refined prices. * * * The Meinrath Brokerage * * * estimate * * * the coming domestic beet crop * * * as 863,000 tons against last year's outturn of 652,957 tons. * * *"

(3) July 8, 1920. "The demand for refined sugar has shown a decided falling off * * *. Of course with the slackening in demand for white sugars there is difficulty in disposing of the high grade raws, some of these sugars being offered around 18½¢ to 19¢, duty-paid. Recent offerings have been made of granulated for February/April 1921 shipment from Atlantic and/or Gulf ports at 20¢ less 2%. The reports from our domestic beet crop are very favorable * * *."[20]

19. Emphasis supplied.

20. The Journal for July 8, 1920, also carried a review of the consumption of sugar during the first six months of the year. Excerpts follow. "* * * The six months' consumption this year * * * shows an increase of only * * *.

(4) July 15, 1920. "The situation locally in refined sugars is unchanged. The demand is very quiet, and it is now quite difficult to dispose of sugars except in scattered localities where supplies are still limited. * * *"

20. (a) On July 19, 1920, Morgan opened a second letter of credit (No. 41) in the amount of $348,500 in favor of Compania and for the account of Watson.[21]

(b) The foregoing credit, and the credit arranged with the Bank of British West Africa (finding 17), represent the only credits shown by the evidence to have been arranged after the exchange of correspondence between Watson and Riley (finding 16).

21. It is not established by the evidence:

(1) That between June 23 (the date of Riley's letter) and July 19, 1920 (the date of Morgan Credit No. 41), Watson had the financing with which to offer Argentine sugar for sale, excepting the commitment of $120,000 of the Bank of British West Africa, which was unused until December (finding 17); or

(2) That after June 23, 1920 (the date of the Riley letter), Watson made commitments for the purchase of Argentine sugar in addition to those made by him in late May or early June through Bolle and Compania, except insofar as Morgan Credit No. 41 and the credit arranged with the Bank of British West Africa may have been used to make the earlier commitments of Watson, Bolle, and Compania available for offer by Watson on the American market; or

(3) That Watson, in arranging either the $120,000 credit with the Bank of British West Africa or Morgan Credit No. 41, did so in reliance on any commitment or undertaking by Riley to supply the names of potential purchasers of Watson's sugar.

22. (a) On July 22, 1920, the Weekly Statistical Sugar Trade Journal reported a "decidedly weak situation" in regard to raw sugars, and said: "The chief cause of the decline has been the disposition on the part of wholesale grocers, manufacturers and jobbers to resell a large part of their foreign white and refined sugars * * *. * * * in many instances these buyers had over estimated their wants, and they now apparently have more sugar than they can conveniently handle and for this reason are trying to dispose of their holdings at the least possible loss. The free offering of this class of sugar has naturally affected the demand for American refiners' product * * *."[22]

(b) Following are excerpts from the reports on refined sugar as contained in the Journal in five succeeding issues extending from July 22 to August 19, 1920.

(1) July 22, 1920. "* * * the demand generally is very quiet and refined buyers are more disposed to sell than to add to their purchases. * * *"

(2) July 29, 1920. "* * * The demand is generally light * * *. Arbuckle * * * had no difficulty in disposing of their latest allotment at 21¢ less 2%, but there is such an urgent disposition to resell that American refiners' granulated has sold in Western cities as low as 19½¢. * * *"

4.094% over that of the same period in 1919. A part of the trade had been calculating on an immense increase in the consumption this year, which was attributed to the increase in the consumption of candies and soft drinks chiefly due to prohibition, but * * * the extent of the increase was curtailed to a large degree by high prices, and the inability at times of buyers to secure sugar * * *. * * * consumption of sugar during the first half of the year usually is

in excess of that of the second half. * * *"

21. This credit, as well as the earlier one (No. 40) in like amount, was unsecured except by the sugar it was to purchase. No details relating to Morgan's commitment or decision to issue it are in evidence.

22. When American refined sugar was available, Argentine sugar sold at discount in United States as compared with the American product.

(3) August 5, 1920. "The demand for refined is very light and with continued free offerings of outside sugars from 17¢ to 18¢, duty paid, for granulated and white raws * * *. * * * The crops in general promise abundant yields; stocks of sugar, while heavy in some sections and light in others, indicate an ample amount to meet requirements."

(4) August 12, 1920. "The demand continues very quiet and there is quite a disposition on the part of grocers to resell Eastern refiners granulated; during the week fair sized lots were sold at 18½¢ * * * and at 18¢ * * *."

(5) August 19, 1920. "Arbuckle's price of 17.10¢ * * * established late on Thursday, continues unchanged, and they report that the business on this basis is very light. * * *"

23. (a) Some time during July and the early part of August 1920, sugar purchased by Watson was shipped from Argentina on account of Watson's sales to Lowney and to Atkins, and on the account of Morgan Credit No. 40. The disposition of the sugar covered by the Morgan credit, amounting to 467 long tons, is not established by the evidence. The amount of sugar shipped to Lowney and Atkins is uncertain.[23]

(b) Shortly after August 19, 1920, the steamship Winona left Buenos Aires for New York with 1,781 long tons of sugar aboard consigned by Compania to Morgan (973 long tons)[24] and to Watson (808 long tons).[25]

(c) It is not established by the evidence that after June 23, 1920 (the date of the Riley letter), Watson was in position to offer Argentine sugar for sale in the United States prior to the departure of the Winona from Buenos Aires.[26]

24. (a) The Winona arrived in New York on September 22, 1920. The cargo of sugar consigned to Morgan and Watson was removed to storage, where it remained for several months.

(b) On September 23, 1920, American refined sugar was being quoted at 14½ cents per pound, according to a report published in the Sugar Trade Journal. Sugar quotations continued a steady decline thereafter.

25. (a) On October 21, 1920, Watson wrote Riley to the effect that he (Watson) had been unable to get any response to many letters sent to the Department of Justice concerning his sugar importations and had therefore taken up the matter with Mr. George W. Wickersham.[27] Riley replied on November 9, 1920, asking Watson to supply him with copies of the letters, since (as he advised) he had received no communications from Watson. Thereafter, an exchange of correspondence occurred as set forth in the next two subparagraphs.

(b) November 12, 1920, from Watson to Riley:

"Answering your esteemed favor of November 9th, I beg to advise you that after our original arrangement in June, I wrote you on June 23rd stating that 'I have 1,000 tons for July shipment and understand you are referring interested parties to me today or tomorrow.'

"You then told me that the Department of Justice was not person-

---

23. Watson is responsible for the statement that the Lowney shipment was 800 tons short. He also recorded, however, that the Atkins shipment was 200 tons short, although he subsequently acknowledged that Atkins had paid him an amount sufficient to cover 1948 long tons at the sale price of 19¼ cents per pound.

24. Morgan Credit No. 41, issued July 19, 1920, in the amount of $348,500 (finding 21) was applied to this portion of the shipment.

25. The $120,000 credit advanced by the Bank of British West Africa (finding 17) was activated on December 2, 1920, and applied to this portion of the shipment.

26. The claim of plaintiff in this case is not concerned with the sugar described in subparagraph (a), above. The claim is based upon losses alleged to have been incurred in connection with (1) the sugar described in subparagraph (b), and (2) another lot of 1,429 long tons which never left Argentina.

27. Mr. Wickersham was Attorney General of the United States, 1909–1913.

ally going to handle any merchandise but that I would receive from Mr. James Boyd of 135 Broadway, instructions where shipments should be directed under the agreement I had made with the Department of Justice. I received one written instruction from Mr. Boyd dated July 23rd to ship 80,000 lbs. of Argentine Refined Sugar to Mr. F. B. Lovelace of Poughkeepsie. When the sugar arrived, I notified Mr. Boyd of this fact, and asked him from whom I was to receive payment. He then told me that I was not to ship the sugar to Mr. Lovelace as he had supplied his requirements elsewhere, and the sugar was left on my hands. Seeing the awkward position I was being placed in through having made any agreement with the Department of Justice, I immediately notified the Department of the arrival of the sugar in New York and asked for their instructions. My letters were ignored. The first one was addressed to the Department of Justice in Washington, for your attention, and the second one to the Department of Justice in Washington, without being marked for your attention. No answer being forthcoming, I presented the arrangement to Mr. Wickersham for his advice, the difficulty that I was being in was having my hands tied as to the disposition of the sugar brought in under the agreement made by me with the Department of Justice.

"I certainly think that the Department should give me every assistance in their power rother [sic] than take the attitude they seem to be doing at the present time by ignoring communications."

(c) November 17, 1920, from Riley to Watson:

"Permit me to refer to your letter dated November 12th in which you acknowledge receipt of my letter of the 9th inst. This would seem to contradict the last paragraph in your letter in which you state you received no replies from me to any of your communications.

"I have heretofore requested you to give me copies of your previous letters, and also to inform me of the nature of the assistance which you seem to expect from this department.

"I suppose you now find yourself in the position in which many sugar speculators are in, namely, threatened with heavy losses, because of the purchase of sugars at a high price, and your inability to dispose of them at a profit to you. Of course, the Government cannot interest itself in transactions of this sort. As I remember it, your sole purpose in coming to this department in the first place was to attempt to get some special dispensation whereby you could sell your sugar at a price in excess of that allowed to the wholesale dealers. I might add that you received exactly the same treatment as did all those dealing or attempting to deal in this commodity. The large importers and refiners were all under the same regulations as were you, and no other one has seen fit to criticize either inferentially or otherwise, our acts in this connection.

"To be perfectly frank, I am more impressed by the losses undergone by the wholesale dealers who have had to have sugar in order to conduct their business than I am at the losses sustained by those who had never before been in the sugar business and merely attempted to exploit the needs of the public at an extremely critical period.

"If, however, I can properly be of any assistance to you, please so inform me."

26. (a) The 1,781 long tons of sugar described in finding 23(b) were sold between December 1920 and March 1921, at a price of approximately 5.6 cents per pound. The proceeds of the sale were applied to the credits advanced by Morgan (Credit No. 41) and the

Bank of British West Africa. After accounts were struck as between these banks and Watson, the latter was indebted to Morgan in a sum in excess of $200,000 and to the other bank for more than $31,000.

(b) In the liquidation of Watson's sugar purchases, 1,429 long tons were sold in Argentina, at a price of approximately 7.8 cents per pound.

(c) Plaintiff's claim in this action is for the losses sustained by Watson in the liquidation of the two lots of sugar described in the preceding subparagraphs.

27. (a) It is not established by the evidence (1) that a loss was sustained on account of the sugar sold in Argentina; (2) that any of such loss, if one was so sustained, fell on Watson; or (3) that if Watson had sustained such a loss, it would have any relation to the Watson-Riley agreement of June 1920 (finding 16).

(b) The course of transactions between Watson and Bolle, and between Bolle and Compania, is not sufficiently developed by the evidence to make possible a coherent account of it.

Both Bolle and Compania subsequently ran into financial difficulties. Whether or not their difficulties were attributable to the collapse of the sugar market is not established by the evidence.

During the early period of Watson's sugar transactions, he was endeavoring to consummate sales in the United States in such manner that the profit therefrom and the advantage to be gained from the falling value of Argentine paper pesos in terms of dollars would suffice to finance Compania in carrying the deposit in Argentina of 30 percent of the sugar purchased.

The evidence does not disclose what disposition was made of this deposit: whether the Argentine Government took over the deposit, on or after August 22, 1920, or permitted the sale of the sugar for home consumption at market value

(finding 6), although the inference favors the latter.

The evidence does not disclose what the exchange rate was between Argentine pesos (paper or gold) and United States dollars at any given date, or when dollars were used to buy pesos, or when payments of pesos were made by Compania, or when or if dollars were paid by Watson to Bolle or by Bolle to Compania for the settlement of accounts, or when or if such accounts were ever settled.

28. (a) The evidence as a whole warrants the inferences (1) that after Watson's venture in Argentine sugar was liquidated, he was ruined financially; (2) that his indebtedness to the banks that had extended credit to him (finding 26) was a substantial factor contributing to his ultimate ruin; and (3) that he did suffer severe losses in the liquidation of the 1,781 tons of sugar shipped on the Winona.

(b) The amount of Watson's losses in the liquidation of the 1,781 tons of sugar cannot be determined from the evidence with exactness. Whether or not the evidence as a whole would support a determination of the amount in the nature of a jury verdict is a question that is not reached in these findings.

29. It is not established by the evidence:

(1) That Riley intended to undertake or implied that he would undertake to supply to Watson the names of purchasers who would buy the sugar Watson expected to import, or that Watson understood Riley at the time to intend or imply such an undertaking; [28] or

(2) That Riley did not "designate the channels through which the sugar shall be distributed" at the conference with Watson on June 18, 1920; [29] or

(3) That, after the Watson-Riley agreement of June 1920, Watson sought or refrained from seeking purchasers of the sugar because of anything contained in the agreement; or

---

28. Defendant concedes that Riley did not at any time supply to Watson the names of such prospective purchasers.

29. The letter on which plaintiff primarily relies was written for Watson by Morgan's attorneys. They were concerned

(4) That, after the Watson-Riley agreement of June 1920, the market in the United States for granulated sugar brought or to be brought from the Argentine was ever such that Watson could have disposed of his commitments or any part thereof at a profit to him.

30. The text of the statute under which this action is prosecuted follows:

" * * * the Court of Claims * * * is, given jurisdiction to hear, determine on the merits, and to render in accordance therewith judgment upon the claim with such interest as the court may determine, of Preston L. Watson, as administrator * * * of Robert A. Watson, deceased, against the United States for alleged loss and damages suffered by Robert A. Watson arising out of certain transactions between said Robert A. Watson and the Department of Justice of the United States, involving the purchase and importation of sugar from the Republic of Argentina in June 1920, and the alleged neglect, refusal, and failure of the Department of Justice to provide for the distribution thereof in accordance with the terms of a written agreement between claimant's decedent and said Department. Suit upon such claim may be instituted at any time within six months after the date of enactment of this Act, notwithstanding the lapse of time, laches, or any statute of limitations. Proceedings for the determination of such claim, and appeals from, and payment of, any judgment thereon shall be in the same manner as in the case of claims over which said court has jurisdiction under section 1491 of title 28 of the United States Code: *Provided,* That this Act shall be construed

only to waive the defense of lack of authority of the Department of Justice or its officers in making said agreement and the immunity from suit of the Government of the United States with respect to the claim of Preston L. Watson, as administrator * * * of Robert A. Watson, deceased, and not otherwise to effect any substantive rights of the parties. Enactment of this Act shall not be construed to raise any implication of liability by the United States."

31. (a) Promptly after the presentation of plaintiff's evidence, defendant moved, under Rule 49(c), 28 U.S.C.A., for dismissal of the action on the ground that "the evidence shows that plaintiff has no right to recover" because—

(1) "There was no contract with the United States to furnish purchasers of sugar;"

(2) "If there was a contract, it was not one to furnish purchasers at a particular price;"

(3) "If it was a contract, there is no evidence of any breach of the contract; and"

(4) "If there was a breach, there is no evidence of any damage."

(b) On the basis of the foregoing findings of fact, with particular reference to the failures of proof recited in findings 21, 23(c), 27, and 29, it is recommended that defendant's motion be granted and that the petition be dismissed.

## Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.

---

at the time with formalizing a commitment to protect Watson from Lever Act prosecution. Language was used in the letter which suggests an effort on their part to project the commitment to a future date, to be established whenever

Riley should formally confirm it. Watson's proposal "to permit your office to designate the channels through which this sugar shall be distributed" may reflect no more than the draftsman's means of projecting the commitment.